317 Ga. 659
FINAL COPY

S23A0702.  THE STATE v. COOK.
S23A0703.  THE STATE v. ROACHE.
S23A0704.  THE STATE v. DELA CRUZ.
S23A0705.  THE STATE v. JACKSON.
S23A0706.  THE STATE v. STROWDER.
S23A0707.  THE STATE v. WHITAKER.

BETHEL, Justice.

Antonio May died from injuries he sustained inside the Fulton County Jail while in the custody of the Fulton County Sheriff. The defendants, Aaron Cook, Jason Roache, Guito Dela Cruz, Omar Jackson, Kenesia Strowder, and William Whitaker, were employed as jailers by the Fulton County Sheriff and were on duty at the Fulton County Jail when May died. The State alleges through indictments of the defendants for felony murder and other crimes that the defendants beat, pepper sprayed, and repeatedly shocked May with an electronic taser, thereby causing his death. Claiming entitlement to the pre-indictment protections afforded to "peace officers" under OCGA § 17-7-52, the defendants sought to quash

their indictments on the basis that they did not receive pre-indictment notice and an opportunity to be heard.

The trial court held an evidentiary hearing on the matter and thereafter entered an order quashing the indictments. The trial court's analysis turned on whether the defendants were "peace officers," as that term is used in OCGA § 17-7-52. After considering definitions of "peace officer" found elsewhere in our Code, the trial court determined that OCGA § 16-1-3 (11), which defines "peace officer" as "any person who by virtue of his office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses," was "most applicable." Applying that definition, the trial court found that, while none of the defendants were empowered to make arrests, they were nevertheless charged with maintaining the public peace. To that end, the trial court reasoned that "within the community of over 3,000 inmates in the Fulton County Jail (which is accessible to the public in various controlled ways), detention officers are *the* maintainers of public order" in the event that "there is a fight in the

mess hall over bad beans or a brawl in the common space over which channel the TV should be on[.]" (Emphasis in original.) Following its finding that the defendants were charged with the control and supervision of inmates at the jail, the trial court determined that the defendants were "vested with a duty to maintain public order, i.e., keep the peace," and, as such, were peace officers entitled to the protections of OCGA § 17-7-52. On that basis, the trial court quashed the indictments. The State appeals. See OCGA § 5-7-1 (a) (1) (allowing the State to appeal in criminal cases from, among other things, "an order, decision, or judgment setting aside or dismissing any indictment").

This appeal presents two issues for our consideration. We must determine, first, whether the trial court properly defined "peace officer" for purposes of OCGA § 17-7-52 and, second, whether the trial court erred by finding that the defendants here fall within that definition. As to the first issue, we reach the same general definition of "peace officer" as the trial court — that is, a "peace officer" is an officer vested by law with a duty to maintain the public peace — but

3

for different reasons and without importing the statutory definition found in OCGA § 16-1-3 (11). As to the second issue, we conclude that the trial court erred by finding that the defendants' duty to control and supervise inmates within the jail constitutes a duty to maintain the public peace. Accordingly, we reverse.

1. We first address what is meant by "peace officer" in OCGA § 17-7-52. And because we must consider the statute's proper construction, our review is de novo. See *Hankla v. Postell*, 293 Ga. 692, 693 (749 SE2d 726) (2013).

To begin, we recall the well-settled principles that guide our inquiry. As in all cases of statutory construction, we remain mindful that "we must give the text its plain and ordinary meaning, view it in the context in which it appears, and read it in its most natural and reasonable way." *State v. Coleman*, 306 Ga. 529, 530 (832 SE2d 389) (2019). Of course, while "[t]he common and customary usages of the words are important, . . . so is their context." (Citation and punctuation omitted.) *Langley v. State*, 313 Ga. 141, 143 (2) (868 SE2d 759) (2022). See also *May v. State*, 295 Ga. 388, 391 (761 SE2d

4

38) (2014) ("In our search for the meaning of a particular statutory provision, we look not only to the words of that provision, but we consider its legal context as well."). "For context, we may look to other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question." (Citation and punctuation omitted.) *Langley*, 313 Ga. at 143 (2). "Thus, we construe statutes in connection and in harmony with the existing law, and as part of a general and uniform system of jurisprudence." (Citation and punctuation omitted.) Id. at 143-144 (2). Guided by these principles, we turn to the statutory text at issue.

OCGA § 17-7-52 (a) provides:

> Before a bill of indictment or special presentment against a present or former peace officer charging the officer with a crime which is alleged to have occurred while he or she was in the performance of his or her duties is presented to a grand jury, the officer shall be given a copy of the proposed bill of indictment or special presentment and notified in writing of the contemplated action by the prosecuting attorney. . . .

OCGA § 17-7-52 does not define "peace officer," and it is not otherwise defined within Title 17. The term is, however, defined elsewhere in our Code. The parties' arguments on appeal, as well as the trial court's ruling, focus on determining which of these statutory definitions of "peace officer" may be applicable to OCGA § 17-7-52. Specifically, the State contends that we should apply the definition of "peace officer" in OCGA § 35-8-2 (8),[1] while the defendants maintain that the trial court properly applied the definition in OCGA § 16-1-3 (11).[2] But the statutory text contradicts the parties' arguments and precludes the mechanical importation of these independent definitions into OCGA § 17-7-52. Indeed, the definitions in both OCGA §§ 16-1-3 and 35-8-2 are limited in

---

[1] OCGA § 35-8-2 (8), which is part of the Georgia Peace Officer Standards and Training Act, identifies five categories of "peace officer" and sets out a separate definition for each category by reference to the person's employer, duties, and powers. As the State notes, several definitions require a person to have "the power of arrest" in order to be deemed a "peace officer" under that statute. But the State does not identify which of the five definitions should be applied in the context of OCGA § 17-7-52; instead, it simply asserts that the defendants do not meet any of those definitions.

[2] OCGA § 16-1-3 (11) says: "[A]ny person who by virtue of his office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses, whether that duty extends to all crimes or is limited to specific offenses."

application by their express language,[3] and OCGA § 17-7-52 does not incorporate by reference any independent statutory definition of "peace officer."[4] This is not to say that these statutory definitions are without significance; they can — and do — provide important context to our ordinary-meaning analysis. See *Seals v. State*, 311 Ga. 739, 740 (1) (860 SE2d 419) (2021) ("The primary determinant of a text's meaning is its context, which includes the structure and history of the text and the broader context in which that text was enacted, including statutory and decisional law that forms the legal background of the written text." (citation and punctuation omitted)). They simply do not play the outsized role the parties ascribe to them. Instead, in the absence of an applicable statutory definition of "peace officer," we must look first to the term's "ordinary, natural, and most

---

[3] OCGA § 16-1-3 applies only within Title 16, while the application of OCGA § 35-8-2 is limited to Chapter 8 of Title 35.

[4] In other sections of our Code, including elsewhere in Title 17, where the statute at issue is found, the General Assembly has incorporated by reference the statutory definitions proposed by the parties. See, e.g., OCGA §§ 17-4-20 (b) (incorporating OCGA § 35-8-2 (8)); 42-8-60 (j) (9) (B) (i) (incorporating OCGA § 35-8-2 (8)); 35-2-36 (c) (incorporating OCGA § 16-1-3 (11)); 16-10-34 (incorporating OCGA § 35-8-2 (8)); 49-4A-8 (i) (2) (incorporating OCGA § 35-8-2 (8)).

basic meaning[.]" *Nuckles v. State*, 310 Ga. 624, 629 (2) (853 SE2d 81) (2020). And, of course, "[t]he ordinary public meaning of statutory text that matters is the meaning the statutory text had at the time it was enacted." *Seals*, 311 Ga. at 740 (1).

The statutory provision at issue here was enacted in 1975.[5] An examination of the relevant sources of ordinary meaning reveals some accord on the basic definition of a peace officer. See *State v. SASS Group*, 315 Ga. 893, 898-899 (2) (a) (885 SE2d 761) (2023) ("[C]ontemporaneous dictionaries from around the time when the text was adopted . . . offer a useful reference for [an ordinary-meaning] analysis."). As a general matter, those sources broadly define a "peace officer" as an officer vested by law with the duty to maintain the public peace. See The American Heritage Dictionary of the English Language 963 (1973) (defining "peace officer" as "[a] law officer, such as a sheriff, responsible for maintaining civil peace"); Webster's New Twentieth Century Dictionary of the English

---

[5] See Ga. L. 1975, p. 607, § 1. OCGA § 17-7-52 has been amended several times since 1975, and each version has used the term "peace officer." See Ga. L. 1997, p. 879, § 1; Ga. L. 2001, p. 487, § 5; Ga. L. 2016, p. 186, § 6.

Language 1317 (1968) (defining "peace officer" as "any officer of the law charged with the preservation of the public peace, as a sheriff, constable, or policeman"). And these definitions comport with the definition of "peace officer" in Black's Law Dictionary, which, around the time of the statute's enactment, defined the term as "generally [including] sheriffs and their deputies, constables, marshals, members of the police force of cities, and other officers whose duty is to enforce and preserve the public peace." Black's Law Dictionary 1287 (4th ed. 1968).

This understanding of "peace officer," a term with deep roots in Georgia law, finds support in a broader context. The term "peace officer" has been used in Georgia statutory law since at least 1793[6] and has also appeared with some regularity in our decisional law,

---

[6] See, e.g., Robert Watkins et al., Digest of the Laws of Georgia, p. 532 (1799) (Act No. 499, Dec. 19, 1793) ("[I]t shall be the duty of the justices of this State . . . on issuing a warrant, to apprehend any person or persons charged with any criminal offence, to direct the peace officer executing the same, to make diligent enquiry as to the property, of which any person charged as aforesaid, may be possessed at the time he or she was apprehended . . . and if any justice or peace officer shall fail to perform the duties hereby required, he shall himself be subject to the payment of the cost with which such criminal may be chargeable. . . .").

beginning with the early opinions of this Court. But the term predates even those sources and in fact derived from the common law. As Blackstone explained,[7] the common law "had a special care and regard for the conservation of the peace," which was considered "the very end and foundation of civil society." See 1 William Blackstone, Commentaries on the Laws of England 349 (8th ed. 1778). In this regard, officers known as "conservators of the peace" were, at first, elected by the people and, after about 1351, appointed by the king "for the maintenance of the public peace." Id. at 349-351. At common law, these conservators of the peace had powers "in suppressing riots and affrays, in taking securities for the peace, and in apprehending and committing felons and other inferior criminals." Id. at 354. Sheriffs, constables, and coroners, among others, were styled conservators of the peace — a term that became interchangeable with peace officers[8] — by virtue of their duty to

---

[7] "[W]e have long accepted [Blackstone] as the leading authority on the common law[.]" *Sons of Confederate Veterans v. Henry County Bd. of Commrs.*, 315 Ga. 39, 48 (2) (a) (880 SE2d 168) (2022).

[8] See *Vandiver v. Endicott*, 215 Ga. 250, 251 (109 SE2d 775) (1959) (the

10

maintain the peace. Id. at 350. And to aid the execution of that duty, peace officers were vested with the concomitant power to apprehend or restrain those who violated the peace within their jurisdictions. Id. at 350. See also 4 Blackstone 290-293 (discussing arrest powers and defining an arrest as "the apprehending or restraining of one's person, in order to be forthcoming to answer to an alleged or suspected crime").

This common-law understanding that peace-officer status flowed from the duties and powers vested in an officer is also reflected in Georgia statutory and decisional law. Our case law has frequently spoken of peace officers in terms of their duty to maintain the public peace. See, e.g., *Parker v. Travelers Ins. Co.*, 174 Ga. 525, 527 (1) (163 SE 159) (1932) ("[A] policeman is a peace officer, whose duties are connected with the public peace[.]"); *Ramsey v. State*, 92 Ga. 53, 62 (17 SE 613) (1893) ("[T]he defendant was engaged in a violation of the public peace amounting to an offence against the

term "conservator of the peace" is "synonymous with the term 'peace officer'"); Black's Law Dictionary (11th ed. 2019) (identifying "conservator of the peace" as an alternative term for "peace officer").

11

laws of the State[;] and it was the duty of the deceased, as a peace-officer, to arrest him."). These judicial decisions painted with broad strokes and portrayed a peace officer's duty to maintain the public peace as generally pertaining to the enforcement of criminal laws.[9] See, e.g., *Ramsey*, 92 Ga. at 62; *Elder v. Camp*, 193 Ga. 320, 322-323 (5) (18 SE2d 622) (1942) ("In exercising [his] duties and powers and acting as a conservator of the peace within his county, a sheriff has the right and duty to enforce the laws enacted for the protection of the lives, persons, property, health, and morals of the people."

---

[9] Both the Georgia Code and Georgia appellate decisions have employed "peace officer" as a collective term to encompass what are now generally considered to be law enforcement officers, such as sheriffs, police officers, and marshals. See, e.g., Penal Code 1910, § 338 ("Any person who shall, without authority, exercise or attempt to exercise the functions of, or hold himself out to [anyone] as, a deputy-sheriff, marshal, policeman, constable, or other peace-officer or detective shall be guilty of a misdemeanor."); Penal Code 1895, § 332 ("No sheriff, mayor, or other person authorized by law to appoint special deputy-sheriffs, constables, marshals, policemen, or other peace-officers, or detectives, to preserve the public peace or detect crime, shall appoint . . . any person who is not a citizen of this State[.]"); *McDuffie v. Perkerson*, 178 Ga. 230, 236 (3) (173 SE 151) (1933) (noting that "[m]any persons perform duties of a public nature who are not officers," including "persons assisting sheriffs and other peace officers"); *Porter v. State*, 124 Ga. 297, 302 (1) (52 SE 283) (1905) (recognizing that Penal Code section "was applicable to municipal peace officers, such as a policeman or town marshal"); *Columbus v. Ogletree*, 96 Ga. 177, 179-180 (2) (22 SE 709) (1895) ("In the absence of any ordinance or statutory provision specially defining the powers and duties of policemen, they are presumptively, as at common law, mere peace officers.").

(citation and punctuation omitted)); *Cook v. Mayor and Council of the City of Macon*, 54 Ga. 468, 469 (1875) (concluding that, for purposes of municipal liability, a police officer appointed by a city was a "peace officer" because his duties were "connected with the public peace in which the state is interested, and in a very wide sense he is a state officer; many of his duties are duties connected with the prevention and punishment of crime").

And our case law recognized that peace officers are vested with the powers necessary to fulfill that duty, most notably the power of arrest. See *Mitchell v. State*, 71 Ga. 128, 138 (1) (1883) (criticizing peace officer's failure to grant request to issue peace warrant and emphasizing that a peace officer "is invested with power to command and restrain" and "should not desist from the performance of his duty . . . when he is bound by every obligation and is fully armed with power to secure peace"); *McCrackin v. State*, 150 Ga. 718, 722 (1) (105 SE 487) (1920) ("[S]ome latitude is allowed to peace officers in making arrests of persons who have violated penal statutes, because it is essential to protection of person and property. . . .

13

[P]eace officers . . . are charged by law with th[e] duty [to make arrests] and are subjected to penalties for failure thereof."); *Porter v. State*, 124 Ga. 297, 307-308 (52 SE 283) (1905) (Lumpkin, J., concurring specially) ("A policeman performs the duty of arresting both for offenses against the State and those against municipal ordinances. He partakes both of the nature of a constable, and a watchman at common law, with such added powers as may result from legislation.").[10]

When OCGA § 17-7-52 was enacted in 1975, the common-law connection between peace officers and the duty to maintain public

---

[10] See also *Graham v. State*, 143 Ga. 440, 443 (2) (85 SE 328) (1915) ("At common law, certain officers, as conservators of the peace, were entrusted with power to make arrests without a warrant in certain cases. . . . As to [arrests for misdemeanors] the officer could arrest without a warrant any person who committed a breach of the peace in his presence or within his view."); *Williford v. State*, 121 Ga. 173, 177 (1) (48 SE 962) (1904) (If an escaped convict is not "legally at liberty," "then any peace officer may arrest him without a warrant and restore him to the imprisonment to which the court has sentenced him. It is the duty of the officer to take prompt action in effecting the capture of the escape[e], and to then turn him over to his lawful custodians within a reasonable time."); *Cobb v. Bailey*, 35 Ga. App. 302, 304-305 (2) (133 SE 42) (1926) ("A peace officer has the right to make an arrest without a warrant, for the purpose of preventing the commission of a felony . . . [and] may make an arrest without a warrant for the purpose of preventing an imminent breach of the peace." (citation and punctuation omitted)).

14

peace was reflected in codified definitions of "peace officer," as well. The first codified definition of the term defined "peace officer" in the context of designating the class of public employees eligible to participate in the Peace Officers' Annuity and Benefit Fund, as persons "required by the term of their employment . . . to give their full time to the preservation of public order, or the protection of life and property, or the detection of crime." Ga. L. 1950, p. 50, § 8 (predecessor to current OCGA § 47-17-1 (5)). The predecessor to current OCGA § 16-1-3 (11) defined a "peace officer" as "any person who by virtue of his office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses, whether that duty extends to all crimes or is limited to specific offenses." Ga. L. 1968, p. 1249, § 1. And under the predecessor to current OCGA § 35-8-2 (8) (A), a "peace officer" was "any officer or member of a law enforcement unit . . . who has the power of arrest, and who is responsible for the enforcing of criminal laws of this State or its political subdivisions." Ga. L. 1970, p. 208, § 2. The common thread between these statutory definitions and the decisional law

15

discussed above is the peace officer's duty to maintain the public peace, generally by enforcing criminal laws through the power of arrest. Because these statutory definitions invariably incorporate the duty to maintain the public peace, they also reflect, whether explicitly or implicitly, the common law's consistent recognition that the arrest power is integral to the performance of that duty.

Having reviewed the background upon which OCGA § 17-7-52 was enacted, what do we make of it all? There can be no question that a peace officer is, at bottom, an officer vested by law with the duty to maintain the public peace. The term's ordinary meaning and its related context readily support that understanding. But, emphasizing OCGA § 16-1-3 (11)'s explicit reference to arrest powers in its definition of the term, the State argues that a person is not a peace officer unless he has both a duty to maintain the public peace *and* the power to effect arrests. As we have seen, the presence of arrest powers is most often a distinguishing feature of a peace officer. And we agree that the presence of arrest powers has significant relevance to determining whether a person is a peace

officer.[11] However, we need not resolve, at least at this juncture, the extent to which the presence of arrest powers might control that analysis because the trial court found that the defendants here do not have arrest powers[12] and because, as we will discuss, the defendants do not have a duty to maintain the public peace.

2. Having determined the basic meaning of "peace officer" for purposes of OCGA § 17-7-52, we turn next to consider whether the trial court erred by finding that the defendants, who maintained

---

[11] For example, we have deemed the presence of statutory arrest powers pertinent, but not dispositive, in the context of determining whether a duty to maintain the public peace is owed for purposes of eligibility in the Peace Officers' Annuity and Benefit Fund Act. See *Vandiver v. Manning*, 215 Ga. 874, 879-880 (114 SE2d 121) (1960) (discussing probation officer's arrest powers); *Endicott*, 215 Ga. at 251-252 (rejecting fire department officer's claim that he was charged with maintaining public peace and was thus a peace officer, despite fact that he was "invested with the powers of police officers and [was] authorized to make arrests within the city" of Atlanta); *Bd. of Commrs. of Peace Officers Annuity & Benefit Fund v. Clay*, 214 Ga. 70, 74 (1) (102 SE2d 575) (1958) (noting that "nothing in the law" authorized motor-carrier inspectors for Georgia Public Service Commission to make any arrests).

[12] On appeal, the defendants briefly argue that their authority to control and supervise inmates within the jail is akin to arrest powers. In support of that claim, they point only to legal authority holding that a person is under arrest for purposes of the Fourth Amendment whenever his liberty is restrained, assert that they have authority to restrain the liberty of inmates confined to the jail, and then summarily conclude that they have arrest powers. But the defendants point to no controlling authority — and we are aware of none — holding that the authority they maintain over jail inmates establishes that they have arrest powers for purposes of OCGA § 17-7-52.

17

order within the jail, meet that definition.[13] We begin and end our inquiry with the duty to maintain public peace.[14]

We have not previously identified what considerations may be relevant to whether a person asserting peace-officer status under OCGA § 17-7-52 is charged with maintaining the public peace. But a few guideposts exist in this area. To start, we have explained that "'[p]ublic order' means the tranquility and security which every person feels under the protection of the law" and that "[t]o preserve the public peace means to secure that quiet and freedom from disturbance which is guaranteed by the law." *Bd. of Commrs. of Peace Officers Annuity & Benefit Fund v. Clay*, 214 Ga. 70, 72 (1)

---

[13] As we noted at the outset, in defining "peace officer" as the term is used in OCGA § 17-7-52, the trial court traversed the wrong analytical path but nevertheless reached the right definitional destination. Thus, in resolving the factual issue of whether the defendants are "peace officers," the trial court applied the correct legal standard, asking whether the defendants are officers vested by law with a duty to preserve the public peace. Accordingly, remand is unnecessary. Cf. *Smith v. Northside Hosp.*, 302 Ga. 517, 531 (3) (807 SE2d 909) (2017).

[14] Because it is clear that the defendants here are not charged with a duty to maintain the public peace, we need not — and, thus, do not — address the remaining determinations underlying the trial court's conclusion that the defendants were peace officers, namely that they were officers and that their duties were vested by law.

(102 SE2d 575) (1958). Accord Black's Law Dictionary 1287, 1393 (4th ed. 1968) (defining "public peace" as "[t]he peace or tranquility of the community in general"). We have also associated a duty to maintain the public peace with a duty to enforce criminal laws. See *Ramsey*, 92 Ga. at 62; *Cook*, 54 Ga. at 469.

When determining, in the context of other statutes, whether an individual was duty-bound to preserve the public order, we have employed a fact-specific analysis, looking to the person's primary duties and assessing whether those duties included maintaining public order, or whether the person's performance of his private duties merely facilitated, or tangentially benefitted, the preservation of the peace. See *Clay*, 214 Ga. at 73-74; *Fleming v. Maddox*, 225 Ga. 737, 740-741 (171 SE2d 276) (1969). For instance, a person who, "incidental to the primary duties of [his] employment, occasionally perform[ed] some of the services of a police officer" did not have a duty to maintain public order. *Vandiver v. Endicott*, 215 Ga. 250, 252 (109 SE2d 775) (1959). See also *Clay*, 214 Ga. at 74 (1) (appellees did not enjoy peace-officer status where their duties

"relate[d] only to the enforcement of the laws and the rules of the Public Service Commission" and they were not authorized "to act as 'peace officers' in the general sense, either in the preservation of public order, or in the protection of life and property, or in the detection of crime"). Finally, we have inquired into the scope of the duties imposed upon a person seeking peace-officer status, comparing those duties to the ones imposed upon a law enforcement officer, the prototypical peace officer. See *Vandiver v. Manning*, 215 Ga. 874, 878-879 (114 SE2d 121) (1960) (comparing duties, authorities, and jurisdiction of probation officer to those of police officers). With these general considerations in mind, we return to the case at hand.

Here, the trial court rested its conclusion that the defendants were charged with preserving the public peace on the sole fact that the defendants were responsible for maintaining order among the inmates confined to the Fulton County Jail.[15] While it is true that

---

[15] The defendants do not argue that the trial court's factual findings are incomplete or that the trial court otherwise overlooked facts that might

the defendants' work may have benefitted the public peace, a tangential benefit to the public peace is not synonymous with a duty to maintain the peace within the community as a whole.[16] See *Fleming*, 225 Ga. at 740-741; *Clay*, 214 Ga. at 73-74 (1); *Endicott*, 215 Ga. at 252. The trial court even acknowledged as much, indicating that the defendants do not maintain "the public order traditionally conceived of." Indeed, any authority the defendants may exercise is constrained to a limited population of inmates and, perhaps, to certain members of the general public who voluntarily enter the jail's boundaries via its controlled access points. And unlike "[l]aw enforcement officers [who] have a general duty to enforce the law and maintain the peace [that] exists 24 hours a day," *Woodard v. State*, 296 Ga. 803, 807 (2) (771 SE2d 362) (2015), there is no indication that the defendants' duty extends beyond the

---

establish their duty to maintain public order. Instead, the defendants argue that, by maintaining order within the jail, they "provide[d] a benefit" to "the surrounding community."

[16] The defendants themselves acknowledge that inmates in the Fulton County Jail are not members of the general community, "should not be out in the community," and have in fact been removed from the general community by virtue of legal process.

21

timeframe of their work shifts or the bounds of the Fulton County Jail.[17] The defendants' duties instead are primarily related to maintaining order at the Fulton County Jail and to supervising the inmates and, therefore, were simply insufficient to establish that the defendants owed a general duty to maintain the public peace within the community at large.

Thus, because the defendants' primary duty of supervising and controlling a defined population of inmates was markedly limited in comparison to a traditional peace officer's and because they had no duty to maintain the public peace in a general sense, we conclude that the trial court erred by deeming them peace officers under OCGA § 17-7-52. We therefore reverse the trial court's quashal of the indictments.

*Judgment reversed. All the Justices concur*.

---

[17] Of course, nothing we say should be understood to undermine the peace-officer status of law enforcement officers with a narrow geographic jurisdiction merely because their physical jurisdiction is relatively small.

Decided October 11, 2023 — Reconsiderations denied November 7, 2023.

Murder. Fulton Superior Court. Before Judge McBurney.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Charles A. Jones, Jr., Richard B. Caplan, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellant.

*The Issa Law Firm, Jonathon J. Majeske*, for appellee (case no. S23A0702).

*Garland Samuel & Loeb, Amanda C. Palmer*, for appellee (case no. S23A0703).

*King Law, Kimani I. King*, for appellee (case no. S23A0704).

*Arora Law Firm, Manubir S. Arora, Devin A. Rafus*, for appellee (case no. S23A0705).

*Chilivis Grubman, Scott R. Grubman, Serreen F. Meki*, for appellee (case no. S23A0706).

*Ross & Pines, Noah H. Pines*, for appellee (case no. S23A0707).